**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

DAVID WOLMAN, SPENCER SANDBURG and MACHELLE BELL, *individually and on behalf of all others similarly situated*,

Plaintiffs,

v.

BAPTIST HEALTH SOUTH FLORIDA, INC., and CERNER CORPORATION d/b/a ORACLE HEALTH,

Defendants.

Case No. 25-cv-23432

**CLASS ACTION**

**JURY TRIAL DEMANDED**

## AMENDED CLASS ACTION COMPLAINT

Plaintiffs David Wolman, Spencer Sandburg, and Machelle Bell ("Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), bring this Amended Class Action Complaint against Defendants Baptist Health South Florida, Inc. and Cerner Corporation d/b/a Oracle Health ("Defendants"), alleging as follows based upon personal knowledge, information and belief, and investigation of counsel.

## NATURE OF THE ACTION

1. Plaintiffs bring this class action against Defendants for its failure to properly secure and safeguard Plaintiffs' and Class Members' sensitive protected health information ("PHI") and personally identifying information ("PII"), and the preventable data breach of Defendants' inadequately protected computer systems.

2. On or around January 22, 2025, cybercriminals hacked into Defendants' computer network systems and stole Plaintiffs' and Class Members' sensitive, confidential PII and PHI stored therein, including their names, Social Security number, and information included within patient medical records, such as medical record numbers, doctors, diagnoses, medicines, test

results, images, care and treatment (collectively, "Private Information"), causing widespread injuries to Plaintiffs and Class Members (the "Data Breach").[1]

3. Defendant Baptist Health South Florida, Inc., is a hospital and medical practice system that has, according to its website, more than 1.8 million patient visits per year.[2]

4. Defendant Oracle Health is "building an open healthcare platform with intelligent tools for data-driven, human-centric healthcare experiences to connect consumers, healthcare providers, payers, and public health and life sciences organizations."[3]

5. Defendant Oracle Health, formerly known as "Cerner", is a "healthcare software-as-a-service (SaaS) company offering Electronic Health Records (EHR) and business operations systems to hospitals and healthcare organizations. After being acquired by Oracle in 2022, Cerner was merged into Oracle Health, with its systems migrated to Oracle Cloud."[4]

6. Plaintiffs and Class Members are current and former patients of Defendants who, in order to obtain healthcare services from Defendants, were and are required to entrust Defendants with their sensitive, non-public Private Information. Defendants could not perform its operations or provide its services without collecting Plaintiffs' and Class Members' Private Information and retains it for many years, at least, even after the patient-provider relationship has ended.

7. Healthcare providers like Defendants that handle Private Information owe the patients to whom that data relates a duty to adopt reasonable measures to protect such information from disclosure to unauthorized third parties, and to keep it safe and confidential. This duty arises

---

[1] *See* Defendants' Notice Letters sent to Plaintiffs (**Exhibit A**).
[2] *See* https://baptisthealth.net/about-baptist-health.
[3] *See* http://www.oracle.com/health/#:~:text=Oracle%20Health%20is%20building%20an%20open%20healthcare,and%20public%20health%20and%20life%20sciences%20organizations.
[4] *See* http://www.bleepingcomputer.com/news/security/oracle-health-breach-compromises-patient-data-at-us-hospitals/.

under contract, statutory and common law, industry standards, representations made to Plaintiffs and Class Members, and because it is foreseeable that the exposure of Private Information to unauthorized persons—and especially hackers with nefarious intentions—will harm the affected individuals, including but not limited to by the invasion of their private health and financial matters.

8. Defendants breached these duties owed to Plaintiffs and Class Members by failing to safeguard their Private Information they collected and maintained, including by failing to implement industry standards for data security to protect against cyberattacks, which failures allowed criminal hackers to access and steal patients' Private Information from Defendants' care.

9. While the full extent of the Private Information exposed and exfiltrated in the Data Breach is currently unknown, upon information and belief, given the extent of Defendants' patient network, at least thousands if not more of Defendants' current and former patients were affected.

10. According to Defendants' notice to victims of the Data Breach ("Notice Letter"), on or around January 22, 2025, Defendants "confirmed that a cybersecurity event involving unauthorized access by a third-party data hosted in the vendor's data migration environment had occurred." Defendants' ensuing investigation revealed that during the incident, unauthorized actors accessed and obtained files containing patients' Private Information, including their name, Social Security number, and information included within patient medical records, such as medical record numbers, doctors, diagnoses, medicines, test results, images, care and treatment.[5]

11. Defendants failed to adequately protect Plaintiffs' and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive data. This unencrypted, unredacted Private Information was compromised due to Defendants' negligent and/or careless

[5] *See* **Ex. A**, Notice Letter dated July 25, 2025.

acts and omissions and its utter failure to protect its patients' sensitive health details.

12. Defendants maintained the Private Information in a reckless manner. In particular, Private Information was maintained on and/or accessible from Defendants' network in a condition vulnerable to cyberattacks. Upon information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendants, and thus, Defendants knew that failing to take reasonable steps to secure the Private Information left it in a dangerous condition.

13. Hackers targeted and obtained Plaintiffs' and Class Members' Private Information from Defendants because of the data's value in exploiting and stealing identities. As a direct and proximate result of Defendants' inadequate data security and breaches of its duties to handle Private Information with reasonable care, Plaintiff s' and Class Members' Private Information has been accessed by hackers and exposed to an untold number of unauthorized individuals. The present and continuing risk to Plaintiffs and Class Members as victims of the Data Breach will remain for their respective lifetimes.

14. The harm resulting from a cyberattack like this Data Breach manifests in numerous ways including identity theft and financial fraud, and the exposure of an individual's Private Information due to a data breach ensures that the individual will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of his or her life. Mitigating that risk, to the extent it is even possible to do so, requires individuals to devote significant time and money to closely monitor their credit, financial accounts, and email accounts, and take several additional prophylactic measures.

15. As a result of the Data Breach, Plaintiffs and Class Members suffered concrete injuries in fact, including but not limited to (a) financial costs incurred mitigating the materialized

risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) actual identity theft and fraud; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of privacy; (h) emotional distress including anxiety and stress in with dealing with the Data Breach; and (i) the continued risk to their sensitive Private Information, which remains in Defendants' possession and subject to further breaches, so long as Defendants fail to undertake appropriate and adequate measures to protect the patient data it collects and maintains.

16. To recover from Defendants for these harms, Plaintiffs, on their own behalves and on behalf of the Class as defined herein, brings claims for negligence/negligence *per se*, breach of implied contract, invasion of privacy, and unjust enrichment, to address Defendants' inadequate safeguarding of Plaintiff s' and Class Members' Private Information in its care.

17. Plaintiffs and Class Members seek damages and equitable/injunctive relief requiring Defendants to (a) disclose the full nature of the Data Breach and types of Private Information exposed; (b) implement data security practices to reasonably guard against future breaches; and (c) provide, at Defendants' expense, all Data Breach victims with lifetime identity theft protection services.

## PARTIES

### *Plaintiff David Wolman*

18. Plaintiff David Wolman is an adult individual who at all relevant times has been a citizen and resident of Boynton Beach, Florida.

19. Plaintiff Wolman is a former patient of Defendants, having obtained healthcare services from Defendants prior to the Data Breach.

20. As a condition of receiving healthcare services from Defendants, Plaintiff Wolman was required to entrust Defendants with his Private Information, including but not limited to his name, date of birth, Social Security number, and confidential health data.

21. Plaintiff Wolman greatly values his privacy and is very careful about sharing his sensitive Private Information. Plaintiff Wolman diligently protects his Private Information and stores any documents containing Private Information in a safe and secure location. He has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

22. Plaintiff Wolman would not have provided his Private Information to Defendants had he known it would be kept using inadequate data security and vulnerable to a cyberattack.

23. At the time of the Data Breach—in or around January 2025—Defendants retained Plaintiff Wolman's Private Information in its network systems with inadequate data security, causing Plaintiff Wolman's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

24. Plaintiff Wolman received Defendants' Notice Letter dated July 25, 2025, informing him that his Private Information was accessed and exposed to unknown, unauthorized cybercriminals through the Data Breach. According to the Notice Letter, hackers gained access to Defendants' computer network systems at some point on or before January 22, 2025, and acquired files containing Plaintiff Wolman's sensitive Private Information, including his full name, Social Security number, and PHI.

25. Plaintiff Wolman further believes his Private Information stolen in the Data Breach, and that of Class Members, was and will be sold and further disseminated on the dark web as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type. The risk of identity

theft is thus impending and has materialized.

26. Plaintiff Wolman has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud, valuable time he otherwise would have spent on other activities.

27. Plaintiff Wolman further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Wolman is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

28. The Data Breach has caused Plaintiff Wolman to suffer fear, anxiety, and stress about the genuine and imminent risk of identity theft facing her, and his sensitive data's publication on the dark web, which is compounded by the fact that Defendants has still not fully informed him of key details about the Data Breach's occurrence or the information stolen.

29. Moreover, following the Data Breach, Plaintiff Wolman has experienced a spike in suspicious spam robocalls and texts using his Private Information, and believes this be an attempt to secure additional Private Information from her.

30. Due to Defendants' inadequate data security practices, the resulting Data Breach, and the foreseeable consequence of Plaintiff Wolman's confidential Private Information ending up in the hands of cybercriminals, Plaintiff Wolman has suffered and will continue to suffer numerous, substantial injuries including but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e)

deprivation of value of his Private Information; (f) invasion of privacy; and (g) the continued risk to his Private Information, which remains backed up in Defendants' possession and subject to further breaches, so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

***Plaintiff Spencer Sandburg***

31. Plaintiff Spencer Sandburg has been receiving medical services and treatment from Baptist Health for at least three years and as recently as February 2025.

32. As a condition of receiving medical services and treatment from Baptist Health, Plaintiff Sandburg was required to provide Defendants with substantial amounts of his PII and PHI.

33. At the time of the Data Breach Oracle retained Plaintiff Sandburg's Private Information in its systems.

34. On or about July 25, 2025, Plaintiff Sandburg received a notice from Baptist Health that his PII and PHI, including his name, Social Security number, and information included within patient medical records, such as medical record numbers, doctors, diagnoses, medicines, test results, images, care and treatment.

35. Plaintiff Sandburg greatly values his privacy and would not have provided his Private Information to Defendants, undertaken the services and paid the amounts he had for medical services, had Defendants timely disclosed that their systems lacked adequate computer and data security practices to safeguard their patients' personal and health information from theft, and that those systems were subject to a data breach.

36. Following the Data Breach, Plaintiff Sandburg received a notification from a credit monitoring service alerting him that his Social Security Number had been identified on the dark

web. This alert likely indicates that his SSN appeared in a dataset known to be traded or sold by cybercriminals. This notification caused Plaintiff substantial distress and confirmed that his most sensitive information, entrusted to Defendants, had been exfiltrated and is currently circulating in illicit online marketplaces.

37. Plaintiff Sandburg suffered actual injury in the form of having his Private Information compromised and/or stolen as a result of the Data Breach, including but not limited to (a) damage to and diminution in the value of his personal, health, and financial information – a form of intangible property that Plaintiff entrusted to Defendants for the purpose of receiving healthcare services from Defendants; (b) violation of privacy rights; and (c) substantially increased risk of future fraud, identity theft, and misuse posed by his Private Information being placed in the hands of criminals.

38. As a result of the Data Breach, Plaintiff Sandburg anticipates spending considerable time and money on an ongoing basis to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach, reviewing financial accounts for any indications of actual or attempted identity theft or fraud, and protecting himself from medical fraud.

39. As a result of the Data Breach, Plaintiff Sandburg has suffered anxiety as a result of the release of his Private Information, which he believed would be protected from unauthorized access and disclosure. These feelings include anxiety about unauthorized parties viewing, selling, and/or using his PII and PHI for purposes of committing cyber and other crimes against his including, but not limited to, fraud and identity theft. Plaintiff is very concerned about this increased, substantial, and continuing risk, as well as the consequences that identity theft and fraud resulting from the Data Breach would have on his life.

40. Plaintiff Sandburg has a continuing interest in ensuring that his Private Information,

which remains in the possession of Defendants, is protected and safeguarded from future breaches.

***Plaintiff Machelle Bell***

41. Plaintiff Marchelle Bell is an adult individual who at all relevant times has been a citizen and resident of Parkland, Florida.

42. Plaintiff Bell is a former patient of Defendants, having obtained healthcare services from Defendants prior to the Data Breach.

43. As a condition of receiving healthcare services from Defendants, Plaintiff Bell was required to entrust Defendants with his Private Information, including but not limited to his name, date of birth, Social Security number, and confidential health data.

44. Plaintiff Bell greatly values his privacy and is very careful about sharing her sensitive Private Information. Plaintiff Bell diligently protects her Private Information and stores any documents containing Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

45. Plaintiff Bell would not have provided his Private Information to Defendants had she known it would be kept using inadequate data security and vulnerable to a cyberattack.

46. At the time of the Data Breach—in or around January 2025—Defendants retained Plaintiff Bell's Private Information in its network systems with inadequate data security, causing Plaintiff Bell's Private Information to be accessed and exfiltrated by cybercriminals in the Data Breach.

47. Plaintiff Bell received Defendants' Notice Letter dated July 25, 2025, informing her that her Private Information was accessed and exposed to unknown, unauthorized cybercriminals through the Data Breach. According to the Notice Letter, hackers gained access to

Defendants' computer network systems at some point on or before January 22, 2025, and acquired files containing Plaintiff Bell's sensitive Private Information, including her full name, Social Security number, and PHI.

48. Plaintiff Bell further believes her Private Information stolen in the Data Breach, and that of Class Members, was and will be sold and further disseminated on the dark web as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type. The risk of identity theft is thus impending and has materialized.

49. Plaintiff Bell has made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to researching the Data Breach and reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud, valuable time he otherwise would have spent on other activities.

50. Plaintiff Bell further anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach. Due to the Data Breach, Plaintiff Bell is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

51. The Data Breach has caused Plaintiff Bell to suffer fear, anxiety, and stress about the genuine and imminent risk of identity theft facing her, and his sensitive data's publication on the dark web, which is compounded by the fact that Defendants has still not fully informed him of key details about the Data Breach's occurrence or the information stolen.

52. Moreover, following the Data Breach, Plaintiff Bell has experienced a spike in suspicious spam robocalls and texts using his Private Information, and believes this be an attempt to secure additional Private Information from her.

53. Due to Defendants' inadequate data security practices, the resulting Data Breach,

and the foreseeable consequence of Plaintiff Bell's confidential Private Information ending up in the hands of cybercriminals, Plaintiff Bell has suffered and will continue to suffer numerous, substantial injuries including but not limited to (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (e) deprivation of value of his Private Information; (f) invasion of privacy; and (g) the continued risk to her Private Information, which remains backed up in Defendants' possession and subject to further breaches, so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

***Defendants***

54. Defendant Baptist Health South Florida, Inc. is a Florida corporation with its principal place of business at 6855 Red Road, Suite 600, Coral Gables, Florida 33143.

55. Defendant Cerner Corporation d/b/a Oracle Health is a Delaware corporation with its headquarters located at 8779 Hillcrest Road, Kansas City, Missouri 64138.

## JURISDICTION AND VENUE

56. The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom including Plaintiffs have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

57. The Court has personal jurisdiction over Defendant Oracle Health because it operates in this District and conducts substantial business in this District.

58. The Court has personal jurisdiction over Defendant Baptist Health South Florida, Inc. because it operates in and has its principal place of business in this District, and conducts substantial business in this District.

59. Venue is proper in the Court pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events giving rise to this action occurred in this District, Defendant Baptist Health South Florida, Inc. maintains substantial operations in this District, the conduct relevant to this action occurred in part within this District, and Defendants have harmed Class Members residing in this District.

## FACTUAL BACKGROUND

### A. Defendants Owed Duties to Adopt Reasonable Data Security Measures for Private Information it Collected and Maintained.

60. Defendant Baptist Health South Florida, Inc. is a healthcare organization with, according to its website, "more than 28,000 employees and more than 4,500 physicians in virtually all specialties."[6]

61. Defendant Oracle Health is "one of the largest EHR vendors thanks to its $28 billion acquisition of medical records giant Cerner in 2022."[7]

62. On information and belief, Defendant Baptist Health South Florida, Inc. used Defendant Cerner Corporation d/b/a Oracle Health as a vendor for electronic health records.

63. Plaintiffs and Class Members are current and former patients of Defendants who received medical healthcare services from Defendants prior to January 22, 2025.

64. As a condition and in exchange for receiving healthcare services from Defendants,

---

[6] *See* https://baptisthealth.net/about-baptist-health.

[7] *See* http://www.cnbc.com/2025/03/06/oracles-federal-electronic-health-record-suffered-nation-wide-outage-.html.

Defendants' patients, including Plaintiffs and Class Members, were required to entrust Defendants with highly sensitive Private Information, including their names, dates of birth, Social Security numbers, and medical records and data.

65. In exchange for receiving Plaintiffs' and Class Members' Private Information, Defendants promised to safeguard the sensitive, confidential data and use it only for authorized and legitimate purposes, and to delete such information from its systems once there was no longer a need to maintain it.

66. The information Defendants held in its computer networks at the time of the Data Breach included the unencrypted Private Information of Plaintiffs and Class Members.

67. At all relevant times, Defendants knew it was storing and using its networks to store and transmit valuable, sensitive Private Information belonging to Plaintiffs and Class Members, and that as a result, its systems would be attractive targets for cybercriminals.

68. Defendants also knew that any breach of its information technology network and exposure of the data stored therein would result in the increased risk of identity theft and fraud for the individuals whose Private Information was compromised, as well as intrusion into those individuals' highly private medical information.

69. Plaintiffs and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information. To that end, Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information.

70. Defendants derived economic benefits from collecting Plaintiffs' and Class Members' Private Information. Without the required submission of Private Information, Defendants could not perform its operations, furnish the services it provides, or receive payment for those services.

71. By obtaining, using, and benefiting from Plaintiffs' and Class Members' Private Information, Defendants assumed legal and equitable duties and knew or should have known that it was responsible for protecting that Private Information from unauthorized access and disclosure.

72. Defendants had and have a duty to adopt reasonable measures to keep Plaintiffs' and Class Members' Private Information confidential and protected from involuntary disclosure to third parties, and to audit, monitor, and verify the integrity of its IT network systems.

73. Additionally, Defendants had and has obligations created by the Federal Trade Commission ("FTC") Act, 15 U.S.C. § 45 ("FTC Act"), the Health Insurance Portability and Accountability Act ("HIPAA"), common law, contract, industry standards, and representations made to Plaintiffs and Class Members, to keep their Private Information confidential and protected from unauthorized disclosure. Defendants failed to do so.

### B. Defendants Failed to Adequately Safeguard Plaintiffs' and Class Member's Private Information, Causing the Data Breach.

74. On or about June 13, 2025, Defendants began sending Plaintiffs and other Data Breach victims the Notice Letters.

75. Plaintiffs' Notice Letter informs as follows, in part:

> **WHAT HAPPENED.** On March 7, 2025, we learned that an unauthorized third party gained access to and obtained data that was maintained by our vendor. The vendor's investigation determined that the unauthorized third party gained access to personal health information on legacy Cerner systems at least as early as January 22, 2025. Baptist Health's computer systems were not impacted in this incident. The vendor later informed us that federal law enforcement asked to delay patient notification as they continued their investigation. As a result, we are notifying you now.
>
> **WHAT INFORMATION WAS INVOLVED.** The personal information involved in this incident may have included your name, Social Security number, and information included within patient medical records, such as medical record numbers, doctors, diagnoses, medicines, test results, images, care and treatment.

76. Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and Class Members, who retain a vested interest in ensuring that their Private Information is protected.

77. Thus, Defendants' purported 'disclosure' to Data Breach victims amounts to no real disclosure at all, as it fails to inform Plaintiffs and Class Members of the Data Breach's critical facts with any degree of specificity. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach was severely diminished.

78. Thus, to make matters worse, although Defendants confirmed the Data Breach's occurrence by March 13, 2025, it waited an additional *3 months* before notifying Plaintiffs and Class Members their Private Information had been compromised, diminishing their ability to timely and thoroughly mitigate and address harms resulting from the Data Breach.

79. As the Data Breach evidences, Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive Private Information it collected and maintained from Plaintiffs and Class Members, such as encrypting the information or deleting it when it is no longer needed, training employees to recognize and guard against cyberattacks, and implementing appropriate logging and alerting measures to promptly detect unauthorized access if it occurs. These failures by Defendants allowed and caused cybercriminals to target Defendants' electronic heath record vendor's network, carry out the Data Breach, continue accessing Defendants' systems for days even after detection, and extract unencrypted files with Plaintiffs and Class Member's Private Information.

80. Plaintiffs' and Class Members' Private Information was targeted, accessed, and stolen by cybercriminals in the Data Breach. Criminal hackers accessed and acquired confidential

files containing Plaintiffs' and Class Members' Private Information from Defendants' systems, where they were kept without adequate safeguards and in unencrypted form.

81. Defendants could have prevented this Data Breach by properly securing and encrypting the files and file servers containing Plaintiffs' and Class Members' Private Information, but failed to do so, causing the Data Breach.

82. Defendants' tortious conduct and breach of contractual obligations, as detailed herein, are evidenced by its failure to recognize the Data Breach until cybercriminals had already accessed Plaintiffs' and Class Members' Private Information, meaning Defendants had no effective means in place to ensure that cyberattacks were detected and prevented.

**C. Defendants Knew of the Risk of a Cyberattack because Healthcare Providers in Possession of Private Information are Particularly Suspectable.**

83. Defendants' negligence in failing to safeguard Plaintiffs' and Class Members' Private Information is exacerbated by the repeated warnings and alerts directed to protecting and securing such data.

84. Private Information of the kind accessed in the Data Breach is of great value to hackers and cybercriminals as it can be used for a variety of unlawful and nefarious purposes, including ransomware, fraudulent misuse, and sale on the dark web.

85. Private Information can also be used to distinguish, identify, or trace an individual's identity, such as their name, Social Security number, and financial records. This may be accomplished alone or in combination with other PII or PHI connected or linked to an individual, such as his or her birthdate, birthplace, and mother's maiden name.

86. Data thieves regularly target entities in the healthcare industry like Defendants due to the highly sensitive information that such entities maintain. Defendants knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who

seek to illegally monetize that Private Information through unauthorized access.

87. Cyber-attacks against institutions such as Defendants are targeted and frequent. According to Contrast Security's 2023 report *Cyber Bank Heists: Threats to the financial sector*, "Over the past year, attacks have included banking trojans, ransomware, account takeover, theft of client data and cybercrime cartels deploying 'trojanized' finance apps to deliver malware in spear-phishing campaigns."[8] In fact, "40% [of financial institutions] have been victimized by a ransomware attack."[9]

88. In light of past high profile data breaches at industry-leading companies, including, for example, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendants knew or, if acting as a reasonable healthcare provider, should have known that the Private Information it collected and maintained would be vulnerable to and targeted by cybercriminals.

89. According to the Identity Theft Resource Center's report covering the year 2021, "the overall number of data compromises (1,862) is up more than 68 percent compared to 2020. The new record number of data compromises is 23 percent over the previous all-time high (1,506) set in 2017. The number of data events that involved sensitive information (Ex: Social Security numbers) increased slightly compared to 2020 (83 percent vs. 80 percent)."[10]

---

[8] Contrast Security, "Cyber Bank Heists: Threats to the financial sector," pg. 5, avail. at http://www.contrastsecurity.com/hubfs/Cyber%20Bank%20Heists%20Report%2020 23.pdf?hsLang=en (last acc. June 25, 2025).

[9] *Id.*, at 15.

[10] *See* "Identity Theft Resource Center's 2021 Annual Data Breach Report Sets New Record for Number of Compromises," Jan. 24, 2022, available at http://www.idtheftcenter.org/post/identity-theft-resource-center-2021-annual-data- breach-report-

90. The increase in such attacks, and attendant risk of future attacks, was widely known to the public and to anyone in Defendants' industry, including Defendants itself. According to IBM's 2022 report, "[f]or 83% of companies, it's not if a data breach will happen, but when."[11]

91. Defendants' data security obligations were particularly important given the substantial increase, preceding the date of the subject Data Breach, in cyberattacks and/or data breaches targeting healthcare entities like Defendants that collect and store PHI.

92. For example, of the 1,862 data breaches recorded in 2021, 330 of them, or 17.7%, were in the healthcare industry.[12]

93. The 330 breaches reported in 2021 exposed nearly 30 million sensitive records (28,045,658), compared to only 306 breaches that exposed nearly 10 million sensitive records (9,700,238) in 2020.[13]

94. Entities in custody of PHI, like Defendants, reported the largest number of data breaches among all measured sectors in 2022, with the highest rate of exposure per breach.[14] Indeed, when compromised, healthcare related data is among the most sensitive and personally consequential. A report focusing on healthcare breaches found the "average total cost to resolve an identity theft-related incident . . . came to about $20,000," and that victims were often forced to pay out of pocket costs for healthcare they did not receive in order to restore coverage.[15] Almost

---

sets-new-record-for-number-of-compromises/ (last accessed June 25, 2025).

[11] IBM, "Cost of a data breach 2022: A million-dollar race to detect and respond," available at http://www.ibm.com/reports/data-breach (last accessed June 25, 2025).

[12] 2021 Data Breach Annual Report (ITRC, Jan. 2022), http://notified.idtheftcenter.org/s/, at 6.

[13] *Id.*

[14] *See* Identity Theft Resource Center, 2022 Annual Data Breach Report, http://www.idtheftcenter.org/publication/2022-data-breach-report/ (last accessed June 25, 2025).

[15] *See* Elinor Mills, *Study: Medical identity theft is costly for victims*, CNET (March 3, 2010), http://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/ (last accessed June 25, 2025).

50 percent of the victims lost their healthcare coverage as a result of the incident, while nearly 30 percent said their insurance premiums went up after the event, while 40 percent of the patients were never able to resolve their identity theft at all. In other words, data breaches and identity theft have a crippling effect on individuals.[16]

95. Thus, the healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[17]

96. As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[18] A complete identity theft kit with health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[19]

97. Given the nature of the Data Breach, it was foreseeable that Plaintiffs' and Class Members' Private Information compromised therein would be targeted by hackers and cybercriminals for use in variety of different injurious ways. Indeed, the cybercriminals who possess Plaintiffs' and Class Members' Private Information can easily obtain their tax returns or open fraudulent credit card accounts in Plaintiffs' and Class Members' names.

---

[16] *Id.*
[17]http://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/.
[18] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.
[19] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: http://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

98. Defendants were, or should have been, fully aware of the unique type and the significant volume of data on its network server(s), amounting to hundreds of thousands of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the unauthorized exposure of that unencrypted data.

99. Plaintiffs and Class Members were the foreseeable and probable victims of Defendants' inadequate security practices and procedures. Defendants knew or should have known of the inherent risks in collecting and storing Private Information and the critical importance of providing adequate security for that information.

100. As a healthcare entity in possession of its patients' and clients' PHI, Defendants knew, or should have known, the importance of safeguarding the PHI entrusted to it by Plaintiffs and Class Members and of the foreseeable consequences if its data security systems were breached. Such consequences include the significant costs imposed on Plaintiffs and Class Members due to a breach. Nevertheless, Defendants failed to take adequate measures to prevent the Data Breach despite knowing the risk such failure would cause.

101. The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Plaintiffs and Class Members especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and the like.

**D. Defendants were Required, but Failed to Comply with FTC Rules and Guidance.**

102. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

103. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for businesses like Defendants.

These guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[20]

104. The FTC's guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[21]

105. The FTC further recommends that companies not maintain confidential personal information, like Private Information, longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

106. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect third parties' confidential data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures business like Defendants must undertake to meet their data security obligations.

107. Such FTC enforcement actions include actions against healthcare entities like

---

[20] *Protecting Personal Information: A Guide for Business*, FEDERAL TRADE COMMISSION (2016),http://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last accessed June 25, 2025).
[21] *Id.*

Defendants. *See, e.g., In the Matter of LabMD, Inc.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

108. Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendants, of failing to use reasonable measures to protect sensitive personal information, like Private Information. The FTC publications and orders described above also form part of the basis of Defendants' duty in this regard.

109. The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[22]

110. Defendants failed to properly implement basic data security practices, in violation of its duties under the FTC Act.

111. Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

---

[22] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf.

**E. Defendants Were Required, But Failed to Comply with HIPAA.**

112. Defendants is a covered business under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E; and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and C.

113. Defendants are further subject to the Health Information Technology Act ("HITECH")'s rules for safeguarding electronic forms of medical information. *See* 42 U.S.C. §17921; 45 C.F.R. § 160.103.

114. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting Private Information that is kept or transferred in electronic form.

115. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

116. HIPAA's Security Rule required and requires that Defendants do the following:

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by its workforce.

117. HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendants is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. §164.312(a)(1).

118. HIPAA and HITECH also require procedures to prevent, detect, contain, and correct data security violations and disclosures of Private Information that are reasonably anticipated but not permitted by privacy rules. *See* 45 C.F.R. § 164.306(a)(1), (a)(3).

119. HIPAA further requires a covered entity like Defendants to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. See 45 C.F.R. § 164.530(e).

120. HIPAA further requires a covered entity like Defendants to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of PHI in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

121. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the

confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[23] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology, which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[24]

122. As alleged in this Complaint, Defendants failed to comply with HIPAA and HITECH. It failed to maintain adequate security practices, systems, and protocols to prevent data loss, failed to mitigate the risks of a data breach, and failed to ensure the confidentiality and protection of Plaintiffs' and Class Members' Private Information, including PHI.

**F. Defendants Failed to Comply with Industry Standards.**

123. A number of industry and national best practices have been published and are widely used as a go-to resource when developing an institution's cybersecurity standards.

124. The Center for Internet Security's (CIS) Critical Security Controls (CSC) recommends certain best practices to adequately secure data and prevent cybersecurity attacks, including Critical Security Controls of Inventory and Control of Enterprise Assets, Inventory and Control of Software Assets, Data Protection, Secure Configuration of Enterprise Assets and Software, Account Management, Access Control Management, Continuous Vulnerability Management, Audit Log Management, Email and Web Browser Protections, Malware Defenses, Data Recovery, Network Infrastructure Management, Network Monitoring and Defense, Security Awareness and Skills Training, Service Provider Management, Application Software Security,

---

[23] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last accessed June 25, 2025).
[24] *Id.*

Incident Response Management, and Penetration Testing.[25]

125. In addition, the NIST recommends certain practices to safeguard systems,[26] *infra,* such as the following:

a. Control who logs on to your network and uses your computers and other devices.

b. Use security software to protect data.

c. Encrypt sensitive data, at rest and in transit.

d. Conduct regular backups of data.

e. Update security software regularly, automating those updates if possible.

f. Have formal policies for safely disposing of electronic files and old devices.

g. Train everyone who uses your computers, devices, and network about cybersecurity. You can help employees understand their personal risk in addition to their crucial role in the workplace.

126. Further still, the Cybersecurity & Infrastructure Security Agency makes specific recommendations to organizations to guard against cybersecurity attacks, including (a) reducing the likelihood of a damaging cyber intrusion by validating that "remote access to the organization's network and privileged or administrative access requires multi-factor authentication, [e]nsur[ing] that software is up to date, prioritizing updates that address known exploited vulnerabilities identified by CISA[,] [c]onfirm[ing] that the organization's IT personnel have disabled all ports and protocols that are not essential for business purposes," and other steps; (b) taking steps to

---

[25] *See* Rapid7, "CIS Top 18 Critical Security Controls Solutions," available at http://www.rapid7.com/solutions/compliance/critical-controls/ (last acc. June 25, 2025).
[26] Federal Trade Commission, "Understanding The NIST Cybersecurity Framework," http://www.ftc.gov/business-guidance/small-businesses/cybersecurity/nist- framework (last acc. June 25, 2025).

quickly detect a potential intrusion, including "[e]nsur[ing] that cybersecurity/IT personnel are focused on identifying and quickly assessing any unexpected or unusual network behavior [and] [e]nabl[ing] logging in order to better investigate issues or events[;] [c]onfirm[ing] that the organization's entire network is protected by antivirus/antimalware software and that signatures in these tools are updated," and (c) "[e]nsur[ing] that the organization is prepared to respond if an intrusion occurs," and other steps.[27]

127. Upon information and belief, Defendants failed to implement industry-standard cybersecurity measures, including by failing to meet the minimum standards of both the NIST Cybersecurity Framework Version 2.0 (including PR.AA-01, PR.AA.-02, PR.AA-03, PR.AA-04, PR.AA-05, PR.AT-01, PR.DS-01, PR-DS-02, PR.DS-10, PR.PS-01, PR.PS-02, PR.PS-05, PR.IR-01, DE.CM-01, DE.CM-03, DE.CM-06, DE.CM-09, and RS.CO-04) and the Center for Internet Security's Critical Security Controls (CIS CSC), which are established frameworks for reasonable cybersecurity readiness, and by failing to comply with other industry standards for protecting Plaintiffs' and Class Members' Private Information, resulting in the Data Breach.

### G. Defendants Owed Plaintiffs and Class Members a Common Law Duty to Safeguard their Private Information.

128. In addition to its obligations under federal and state laws, Defendants owed a duty to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting the Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Defendants' duty owed to Plaintiffs and Class Members obligated it to provide reasonable data security, including consistency with industry standards and requirements, and to ensure that its computer systems,

[27] Cybersecurity & Infrastructure Security Agency, "Shields Up: Guidance for Organizations," available at http://www.cisa.gov/shields-guidance-organizations (last visited June 25, 2025).

networks, and protocols adequately protected Plaintiffs' and Class Members' Private Information.

129. Defendants owed a duty to Plaintiffs and Class Members to create and implement reasonable data security practices and procedures to protect the Private Information in its possession, including adequately training its employees and others who accessed Private Information within its computer systems on how to adequately protect Private Information.

130. Defendants owed a duty to Plaintiffs and Class Members to implement processes that would detect a compromise of Private Information in a timely manner.

131. Defendants owed a duty to Plaintiffs and Class Members to act upon data security warnings and alerts in a timely fashion.

132. Defendants owed a duty to Plaintiffs and Class Members to disclose in a timely and accurate manner when and how the Data Breach occurred.

133. Defendants owed a duty of care to Plaintiffs and Class Members because they were foreseeable and probable victims of any inadequate data security practices.

134. Defendants failed to take the necessary precautions required to safeguard and protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure. Defendants' actions and omissions represent a flagrant disregard of Plaintiffs' and Class Members' rights.

### H. Plaintiffs and Class Members Suffered Common Injuries and Damages due to Defendants' Conduct.

135. Defendants' failure to implement or maintain adequate data security measures for Plaintiffs' and Class Members' Private Information directly and proximately caused injuries to Plaintiffs and Class Members by the resulting disclosure of their Private Information in the Data Breach.

136. The ramifications of Defendants' failure to keep secure the Private Information of

Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen fraudulent use of that information and damage to victims may continue for years.

137. Plaintiffs and Class Members are also at a continued risk because their Private remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendants fails to undertake the necessary and appropriate security and training measures to protect its patients' and/or clients' Private Information.

138. As a result of Defendants' ineffective and inadequate data security practices, the resulting Data Breach, and the foreseeable consequences of their Private Information ending up in criminals' possession, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including, without limitation, (a) invasion of privacy; (b) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (d) financial costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) deprivation of value of their Private Information; (g) loss of the benefit of their bargain with Defendants; (h) emotional distress including anxiety and stress in dealing with the Data Breach's aftermath; and (i) the continued risk to their sensitive Private Information, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect the Private Information it collects and maintains.

***The Risk of Identity Theft to Plaintiffs and Class Members is Present and Ongoing***

139. Plaintiffs and Class Members are at a heightened risk of identity theft for years to

come because of the Data Breach.

140. The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[28] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[29]

141. The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal individuals' personal data to monetize the information. Criminals monetize the data by selling the stolen information on the internet black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

142. The dark web is an unindexed layer of the internet that requires special software or authentication to access.[30] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or "surface" web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[31] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

143. A sophisticated black market exists on the dark web where criminals can buy or

---

[28] 17 C.F.R. § 248.201 (2013).
[29] *Id.*
[30] *What Is the Dark Web?*, Experian, available at http://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.
[31] *Id.*

sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[32] The digital character of Private Information stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security numbers, dates of birth, and medical information.[33] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[34]

144. The unencrypted Private Information of Plaintiffs and Class Members has already been published and will end up for further sale on the dark web because that is the *modus operandi* of hackers. In addition, unencrypted and detailed Private Information may fall into the hands of companies that will use it for targeted marketing without the approval of Plaintiffs and Class Members. Unauthorized individuals can easily access the Plaintiffs' and Class Members' Private Information.

145. Because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or to track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

---

[32] *What is the Dark Web?* – Microsoft 365, available at http://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

[33] *Id.; What Is the Dark Web?*, Experian, available at http://www.experian.com/blogs/ask-experian/what-is-the-dark-web/.

[34] *What is the Dark Web?* – Microsoft 365, available at http://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web.

146. For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

147. Identity thieves can also use an individual's personal data and Private Information to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information. In addition, identity thieves may obtain a job using the victim's information, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.[35]

148. Theft of PHI, in particular, is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[36]

149. Health information is likely to be used in detrimental ways, including by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-

[35] *Identity Theft and Your Social Security Number*, Social Security Administration, 1 (2018), http://www.ssa.gov/pubs/EN-05-10064.pdf.

[36] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.

term identity theft.[37]

150. Another study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[38]

151. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[39]

152. "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[40]

153. The reality is that cybercriminals seek nefarious outcomes from a data breach" and "stolen health data can be used to carry out a variety of crimes."[41]

154. One such example of criminals piecing together bits and pieces of compromised Private Information for profit is the development of "Fullz" packages.[42]

---

[37] *Id.*
[38] http://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.
[39] *Id.*
[40] http://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.
[41] http://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[42] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes,

155. With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals.

156. The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

157. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a jury, to find that their stolen Private Information is being misused, and that such misuse is traceable to the Data Breach.

158. Victims of identity theft can suffer from both direct and indirect financial losses. According to a research study published by the Department of Justice:

> A direct financial loss is the monetary amount the offender obtained from misusing the victim's account or personal information, including the estimated value of goods, services, or cash obtained.

---

including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen from Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), http://krebsonsecuritv.com/2014/09/ medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-firm (last visited June 25, 2025).

> It includes both out-of-pocket loss and any losses that were reimbursed to the victim. An indirect loss includes any other monetary cost caused by the identity theft, such as legal fees, bounced checks, and other miscellaneous expenses that are not reimbursed (e.g., postage, phone calls, or notary fees). All indirect losses are included in the calculation of out-of-pocket loss.[43]

159. According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[44]

160. Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[45] Yet, Defendants failed to rapidly report to Plaintiffs and the Class that their Private Information was stolen.

161. Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

162. In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

163. Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs

---

[43] Erika Harrell, *Bureau of Just. Stat.*, U.S. DEP'T OF JUST., NCJ 256085, *Victims of Identity Theft*, 2018 I (2020) http://bjs.ojp.gov/content/pub/pdf/vit18.pdf (last accessed June 25, 2025).
[44] *See* http://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120.
[45] *Id.*

and Class Members will need to remain vigilant for years or even decades to come.

***Loss of Time to Mitigate the Risk of Identify Theft and Fraud***

164. As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm—yet the asset of time has been lost.

165. In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record

166. Thus, due to the actual and imminent risk of identity theft, Plaintiffs and Class Members must monitor their financial accounts for many years to mitigate that harm.

167. Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover.

168. These efforts are consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports,

contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[46]

169. Once Private Information is exposed, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly their entire lives, as a result of Defendants' conduct that caused the Data Breach.

***Diminished Value of Private Information***

170. Personal data like Private Information is a valuable property right.[47] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

171. For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals, and other healthcare service providers often purchase PHI on the black market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

172. Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data sells on the dark web for $50 and up.[48]

---

[46] *See* Federal Trade Commission, *Identity Theft.gov*, http://www.identitytheft.gov/Steps (last visited June 25, 2025).

[47] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) (PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[48] http://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content.

173. An active and robust legitimate marketplace for personal information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[49] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[50, 51] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[52]

174. As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and black markets, has been damaged and diminished in its value by its unauthorized and likely release onto the dark web, where holds significant value for the threat actors.

175. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

***Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary***

176. To date, Defendants has done little to provide Plaintiffs and Class Members with relief for the damages they have suffered as a result of the Data Breach.

177. Given the type of targeted attack in this case and sophisticated criminal activity, the type of information involved, and the *modus operandi* of cybercriminals, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the

[49] http://www.latimes.com/business/story/2019-11-05/column-data-brokers.
[50] http://datacoup.com/.
[51] http://digi.me/what-is-digime/.
[52] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at http://computermobilepanel.nielsen.com/ui/US/en/faqen.html.

dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes—*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; filing false tax returns; taking out loans or insurance; or filing false unemployment claims.

178. Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

179. Furthermore, the information accessed and disseminated in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[53] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change (such as medical histories).

180. Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

181. The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendants' Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendants' failure to safeguard their Private Information.

***Loss of Benefit of the Bargain***

---

[53] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), http://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1.

182. Furthermore, Defendants' poor data security deprived Plaintiffs and Class Members of the benefit of their bargain.

183. When agreeing to provide their Private Information, which was a condition precedent to obtain services from Defendants, and paying Defendants, directly or indirectly, for its services, Plaintiffs and Class Members, as patients and consumers, understood and expected that they were, in part, paying for services and data security to protect the Private Information they were required to provide.

184. In fact, Defendants did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains struck with Defendants.

## **CLASS ALLEGATIONS**

185. Plaintiffs bring this class action under the Florida Rules of Civil Procedure 1.220(a) and (b)(3) individually and on behalf of all members of the following class:

> All individuals residing in the United States whose Private Information may have been compromised in the Data Breach, including all persons who received a Notice Letter (the "Class").

186. Excluded from the Class are Defendants' officers and directors, and any entity in which Defendants has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendants. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

187. Plaintiffs hereby reserve the right to amend or modify the Class definition with greater specificity or division after having had an opportunity to conduct discovery.

188. Numerosity. The members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiffs at this time, based on information and belief, Defendants is aware of the number of affected individuals based

on its administration of Notice Letters.

189. Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Whether Defendants unlawfully used, maintained, or disclosed Private Information;

b. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c. Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d. Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

e. Whether Defendants owed a duty to Class Members to safeguard their Private Information;

f. Whether Defendants breached its duty to Class Members to safeguard their Private Information;

g. Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h. Whether Defendants knew or should have known that its data security systems and monitoring processes were deficient;

i. Whether Class Members suffered legally cognizable damages as a result of Defendants' misconduct;

j. Whether Defendants' conduct was negligent;

k. Whether Defendants breached implied contracts for adequate data security with Class Members;

l. Whether Defendants was unjustly enriched by retention of the monetary benefits conferred on it by Class Members; and

m. Whether Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

190. Typicality. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

191. Adequacy of Representation. Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

192. Predominance. Defendants have engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

193. Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high

and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial and party resources, and protects the rights of each Class Member.

194. Defendants has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and declaratory relief are appropriate on a class-wide basis.

195. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to the following:

a. Whether Defendants owed a legal duty to Plaintiffs and the Class to exercise due care in collecting, storing, and safeguarding their Private Information;

b. Whether Defendants' security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

c. Whether Defendants' failure to institute adequate protective security measures amounted to negligence;

d. Whether Defendants failed to take commercially reasonable steps to safeguard patient Private Information; and

e. Whether adherence to FTC and HIPAA data security requirements and/or industry standard data security measures would have reasonably prevented the Data Breach.

196. Finally, all members of the proposed Class are readily ascertainable. Defendants

has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified by Defendants.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE/NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Class)

197. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 196 above as if fully set forth herein.

198. Defendants required Plaintiffs and Class Members to submit private, confidential Private Information to Defendants as a condition of receiving healthcare services from Defendants.

199. Plaintiffs and Class Members provided certain Private Information to Defendants including their names, dates of birth, Social Security numbers, medical records/data, and other sensitive information.

200. Defendants had full knowledge of the sensitivity of the Private Information to which it was entrusted, and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information was wrongfully disclosed to unauthorized persons. Defendants had a duty to Plaintiffs and each Class Member to exercise reasonable care in holding, safeguarding, and protecting their Private Information.

201. Plaintiffs and Class Members were the foreseeable victims of any inadequate safety and security practices by Defendants.

202. Plaintiffs and the Class Members had no ability to protect their Private Information in Defendants' possession.

203. By collecting and storing Plaintiffs' and Class Members' Private Information in its network systems, Defendants had a duty of care to use reasonable means to secure and safeguard

it, to prevent disclosure of the information, and to safeguard the Private Information from theft. Defendants' duty included a responsibility to implement processes by which it could detect if that Private Information was exposed to unauthorized actors and to give prompt notice to those affected in the case of a data breach.

204. Defendants owed a duty to Plaintiffs and the Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

205. Defendants' duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendants and its patients, which is recognized by laws and regulations including but not limited to the FTC Act and HIPAA, as well as by the common law. Defendants was able to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Plaintiffs and Class Members from a cybersecurity event like this Data Breach, whereas Plaintiffs and Class Members were not.

206. Defendants' duty also arose from its position as a healthcare provider. Defendants hold themselves out as a trusted provider of outpatient medical services and thereby assumes a duty to reasonably protect its patients' Private Information. Indeed, Defendants, as a healthcare provider, was in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members due to the Data Breach.

207. Defendants had a duty to employ reasonable security measures under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

208. Pursuant to the FTC Act, 15 U.S.C. § 45, Defendants had a duty to provide adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information.

209. Pursuant to HIPAA, 42 U.S.C. § 1302d *et seq*., Defendants had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

210. Pursuant to HIPAA, Defendants had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key." *See* 45 C.F.R. § 164.304.

211. Additionally, pursuant to HIPAA, Defendants had a duty to provide notice of the Data Breach within 60 days of discovering it. *See* 42 C.F.R. § 2.16(b); 45 C.F.R. § 164.404(b).

212. Defendants breached its duties to Plaintiffs and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information, by failing to encrypt or timely delete the Private Information from its network systems, and by failing to provide notice to Plaintiffs and Class Members of the Data Breach until over 60 days after Defendants discovered it.

213. Defendants' violation of the statutes described herein directly caused and/or were a substantial factor in the Data Breach and resulting injuries to Plaintiffs and Class Members.

214. Plaintiffs and Class Members are within the class of persons the FTC Act and HIPAA were intended to protect.

215. The type of harm that resulted from the Data Breach was the type of harm the FTC

Act and HIPAA were intended to guard against.

216. Defendants' failure to comply with the FTC Act and HIPAA constitutes negligence *per se.*

217. Defendants' duty to use reasonable care in protecting Plaintiffs' and Class Members' Private Information in its possession arose not only as a result of the statutes and regulations described above, but also because Defendants is bound by industry standards to secure such Private Information.

218. Defendants breached its duties, and was negligent by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information. The specific negligent acts and omissions committed by Defendants include, but are not limited to, the following:

a. Failing to adopt, implement, and maintain adequate security measures to safeguard Plaintiffs' and Class Members' Private Information;

b. Failing to adequately train employees on proper cybersecurity protocols;

c. Failing to adequately monitor the security of its networks and systems;

d. Failure to periodically ensure that its network system had plans in place to maintain reasonable data security safeguards;

e. Allowing unauthorized access to Plaintiffs' and Class Members' Private Information; and

f. Failing to timely notify Plaintiffs and Class Members about the Data Breach so they could take appropriate steps to mitigate their damages.

219. But for Defendants' wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, the Data Breach would not have occurred or at least would have been mitigated, Plaintiffs' and Class Members' Private Information would not have been compromised,

and Plaintiffs and Class Members' injuries would have been avoided.

220. It was foreseeable that Defendants' failure to use reasonable measures to protect Plaintiffs' and Class Members' Private Information would injure Plaintiffs and Class Members. Further, the breach of security was reasonably foreseeable to Defendants given the known high frequency of cyber-attacks and data breaches in the healthcare industry.

221. It was therefore foreseeable that the failure to adequately safeguard Plaintiffs' and Class Members' Private Information would cause them one or more types of injuries.

222. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will suffer injuries and damages, including but not limited to (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) actual identity theft and fraud; (d) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (e) loss of benefit of the bargain; and (f) the continued and certainly increased risk to their Private Information, which (i) remains unencrypted and available for unauthorized third parties to access and abuse; and (ii) remains in Defendants' possession and subject to further unauthorized disclosures so long as Defendants fails to undertake appropriate and adequate measures to protect it.

223. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injuries and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

224. Plaintiffs and Class Members are entitled to damages, including compensatory, and nominal damages, in an amount to be proven at trial.

225. Plaintiffs and Class Members are also entitled to injunctive relief requiring

Defendants to (a) strengthen its data security systems and monitoring procedures; (b) submit to future annual audits of those systems and monitoring procedures; and (c) continue to provide adequate credit monitoring to all Class Members.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

226. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 196 above as if fully set forth herein.

227. Defendants required Plaintiffs and Class Members to provide and entrust their Private Information to Defendants as a condition of and in exchange for receiving healthcare services from Defendants.

228. When Plaintiffs and Class Members provided their Private Information to Defendants, they entered into implied contracts with Defendants pursuant to which Defendants agreed to safeguard and protect such Private Information and to timely and accurately notify Plaintiffs and Class Members if and when their Private Information was breached and compromised.

229. Specifically, Plaintiffs and Class Members entered into valid and enforceable implied contracts with Defendants when they agreed to provide their Private Information to Defendants in exchange for Defendants' reasonable security for Plaintiffs' and Class Members' Private Information.

230. The valid and enforceable implied contracts that Plaintiffs and Class Members entered into with Defendants included Defendants' promises to protect Private Information it collected from Plaintiffs and Class Members, or created on its own, from unauthorized disclosures. Plaintiffs and Class Members provided this Private Information in reliance on Defendants'

promises, including those in Defendants' Privacy Policy, set forth *supra*.

231. Under the implied contracts, Defendants promised and was obligated to (a) provide healthcare services; and (b) protect Plaintiffs' and Class Members' Private Information provided to obtain such services and/or created in connection therewith. In exchange, Plaintiffs and Class Members agreed to provide Defendants with payment and their Private Information.

232. Defendants promised and warranted to Plaintiffs and Class Members, including through its public-facing privacy documents identified *supra*, to maintain the privacy and confidentiality of the Private Information it collected from Plaintiffs and Class Members and to keep such information safeguarded against unauthorized access and disclosure.

233. Defendants' adequate protection of Plaintiffs' and Class Members' Private Information was a material aspect of these implied contracts with Defendants.

234. Defendants solicited and invited Plaintiffs and Class Members to provide their Private Information as part of Defendants' regular business practices. Plaintiffs and Class Members accepted Defendants' offers and provided their Private Information to Defendants.

235. In entering into such implied contracts, Plaintiffs and Class Members reasonably believed and expected that Defendants' data security practices complied with industry standards and relevant laws and regulations, including the FTC Act and HIPAA, as well as industry standards.

236. Plaintiffs and Class Members who contracted with Defendants for healthcare services including reasonable data protection and provided their Private Information to Defendants reasonably believed and expected that Defendants would adequately employ adequate data security to protect that Private Information.

237. A meeting of the minds occurred when Plaintiffs and Class Members agreed to, and

did, provide their Private Information to Defendants and agreed Defendants would receive payment for, amongst other things, the protection of their Private Information.

238. Plaintiffs and Class Members performed their obligations under the contracts when they provided their Private Information and/or payment to Defendants.

239. Defendants materially breached its contractual obligations to protect the Private Information it required Plaintiffs and Class Members to provide when that Private Information was unauthorizedly disclosed in the Data Breach due to Defendants' inadequate data security measures and procedures.

240. Defendants further materially breached its contractual obligations, including the implied covenant of good faith and fair dealing, when it failed to promptly notify Plaintiffs and Class Members of the Data Breach.

241. Defendants materially breached the terms of its implied contracts, including but not limited to by failing to comply with industry standards or the standards of conduct embodied in statutes or regulations like Section 5 of the FTC Act and HIPAA, by failing to otherwise protect Plaintiffs' and Class Members' Private Information, as set forth *supra*.

242. The Data Breach was a reasonably foreseeable consequence of Defendants' breaches of these implied contracts with Plaintiffs and Class Members.

243. As a result of Defendants' failures to fulfill the data security protections promised in these contracts, Plaintiffs and Class Members did not receive the full benefit of their bargains with Defendants, and instead received services of a diminished value compared to that described in the implied contracts. Plaintiffs and Class Members were therefore damaged in an amount at least equal to the difference in the value of the services with data security protection they paid for and that which they received.

244. Had Defendants disclosed that its data security procedures were inadequate or that it did not adhere to industry standards for cybersecurity, neither Plaintiffs, Class Members, nor any reasonable person would have contracted with Defendants.

245. Plaintiffs and Class Members would not have provided and entrusted their Private Information to Defendants in the absence of the implied contracts between them and Defendants.

246. As a direct and proximate result of Defendants' breach of its implied contracts with Plaintiffs and Class Members and the attendant Data Breach, Plaintiffs and Class Members have suffered injuries and damages as set forth herein and have been irreparably harmed, as well as suffering and the loss of the benefit of the bargain they struck with Defendants.

247. Plaintiffs and Class Members are entitled to damages in an amount to be proven at trial.

**COUNT III**
**INVASION OF PRIVACY/INSTRUSION UPON SECLUSION**
**(On behalf of Plaintiffs and the Class)**

248. Plaintiffs re-allege and incorporate by reference paragraphs 1 through 196 above as if fully set forth herein.

249. Plaintiffs and Class Members had a legitimate expectation of privacy to their Private Information and were entitled to Defendants' protection of this Private Information in its possession against disclosure to unauthorized third parties.

250. Defendants owed a duty to its patients, including Plaintiffs and Class Members, to keep their Private Information confidential and secure.

251. Defendants failed to protect Plaintiffs' and Class Members' Private Information and instead exposed it to unauthorized persons, a notorious ransomware group, which has already made the Private Information publicly available and disseminated it to thousands of people,

including through publishing the data on its dark web leak site, where cybercriminals go to find their next identity theft and extortion victims.

252. Defendants allowed unauthorized third parties access to and examination of the Private Information of Plaintiffs and Class Members, by way of Defendants' failure to protect the Private Information through reasonable data security measures.

253. The unauthorized release to, custody of, and examination by unauthorized third parties of the Private Information of Plaintiffs and Class Members is highly offensive to a reasonable person and represents an intrusion upon Plaintiffs' and Class Members' seclusion as well as a public disclosure of private facts.

254. The intrusion was into a place or thing, which was private and is entitled to be private—sensitive and confidential information including private medical diagnoses and laboratory test results.

255. Plaintiffs and Class Members disclosed their Private Information to Defendants as a condition of and in exchange for receiving healthcare services, but privately with an intention that the Private Information would be kept confidential and protected from unauthorized disclosure. Plaintiffs and Class Members reasonably believed such information would be kept private and would not be disclosed without their authorization, given Defendants' promises to that effect.

256. Subsequent to the intrusion, Defendants permitted Plaintiffs' and Class Members' data to be published online to countless cybercriminals whose mission is to misuse such information, including through identity theft and extortion.

257. The Data Breach constitutes an intentional or reckless interference by Defendants with Plaintiffs' and Class Members' interests in solitude or seclusion, as to their persons or as to

their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

258. Defendants acted with a knowing state of mind when it permitted the Data Breach to occur, because it had actual knowledge that its information security practices were inadequate and insufficient to protect Plaintiffs' and Class Members' Private Information from unauthorized disclosure.

259. Defendants acted with reckless disregard for Plaintiffs' and Class Members' privacy when it allowed improper access to its systems containing Plaintiffs' and Class Members' Private Information without protecting said data from the unauthorized disclosure, or even encrypting such information.

260. Defendants was aware of the potential of a data breach and failed to adequately safeguard its network systems or implement appropriate policies to prevent the unauthorized release of Plaintiffs' and Class Members' Private Information to cybercriminals.

261. Because Defendants acted with this knowing state of mind, it had notice and knew that its inadequate and insufficient information security practices would cause injury and harm to Plaintiffs and Class Members.

262. As a direct and proximate result of Defendants' acts and omissions set forth above, Plaintiffs' and Class Members' Private Information was disclosed to third parties without authorization, causing Plaintiffs and Class Members to suffer injuries and damages including, without limitation, (a) invasion of privacy; (b) lost or diminished value of their Private Information; (c) out-of-pocket and lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach, including but not limited to lost time; (d) loss of benefit of the bargain; and (e) the continued and certainly increased risk to their Private Information, which remains in Defendants' possession in unencrypted form and subject to further

unauthorized disclosures, so long as Defendants fails to undertake appropriate and adequate measures to protect it.

263. Unless and until enjoined and restrained by order of this Court, Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and Class Members in that the Private Information maintained by Defendants can be viewed, distributed, and used by unauthorized persons for years to come. Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for monetary damages will not end the invasion of privacy for Plaintiffs and Class Members.

**COUNT IV**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

264. Plaintiffs re-allege and incorporate by reference herein all the allegations contained in paragraphs 1 through 196 above, as if fully set forth herein.

265. Plaintiffs and Class Members conferred a direct benefit on Defendants by way of providing payment and their confidential and sensitive Private Information to Defendants as part of Defendants' business.

266. Defendants required Plaintiffs' and Class Members' Private Information to conduct its business and generate revenue, which it could not do without collecting and maintaining Plaintiffs' and Class Members' Private Information.

267. The monies Plaintiffs and Class Members paid to Defendants included a premium for Defendants' cybersecurity obligations and were supposed to be used by Defendants, in part, to pay for the administrative and other costs of providing reasonable data security and protection for Plaintiffs' and Class Members' Private Information.

268. Defendants benefitted from collecting and using Plaintiffs' and Class Members'

Private Information, using it to generate revenue and market its services.

269. Defendants enriched itself by hoarding the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Private Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendants calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheap, ineffective security measures and diverting those funds to its own personal use. Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize its own profits over the requisite security and the safety of their Private Information.

270. Defendants failed to provide reasonable security, safeguards, and protections to the Private Information of Plaintiffs and Class Members, and as a result, Defendants was overpaid.

271. Under principles of equity and good conscience, Defendants should not be permitted to retain the money Plaintiffs and Class Members paid it because Defendants failed to provide adequate safeguards and security measures to protect Plaintiffs' and Class Members' Private Information, which Plaintiffs and Class Members paid for but did not receive.

272. Defendants wrongfully accepted and retained these benefits—payment and Plaintiff's and Class Members' Private Information—and was enriched to the detriment of Plaintiffs and Class Members.

273. Defendants' enrichment at Plaintiffs' and Class Members' expense is unjust.

274. As a result of Defendants' wrongful conduct and resulting unjust enrichment, Plaintiffs and Class Members are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendants, plus reasonable attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, pray for judgment as follows:

A. An Order certifying this case as a class action on behalf of Plaintiffs and the proposed Class, appointing Plaintiffs as class representative, and appointing her counsel to represent the Class;

B. Awarding Plaintiffs and the Class damages that include applicable compensatory, actual, exemplary, and punitive damages, as allowed by law;

C. Awarding restitution and damages to Plaintiffs and the Class in an amount to be determined at trial;

D. Awarding declaratory and other equitable relief as is necessary to protect the interests of Plaintiffs and the Class;

E. Awarding injunctive relief as is necessary to protect the interests of Plaintiffs and the Class;

F. Awarding attorneys' fees and costs, as allowed by law,

G. Awarding prejudgment and post-judgment interest, as provided by law;

H. Granting Plaintiffs and the Class leave to amend this complaint to request punitive damages, if appropriate, and/or to conform to the evidence produced at trial; and,

I. Any and all such relief to which Plaintiffs and the Class are entitled.

**JURY TRIAL DEMAND**

Plaintiffs hereby demand a trial by jury of all issues so triable.

Dated: August 8, 2025

Respectfully submitted,

By: */s/ Jeff Ostrow*
Jeff Ostrow FBN 121452
Steven Sukert FBN 10122912
**KOPELOWITZ OSTROW P.A.**

One West Las Olas Blvd, Suite 500
Fort Lauderdale, FL 33301
Tel: (954) 525-4100
ostrow@kolawyers.com
sukert@kolawyers.com

*Attorneys for Plaintiffs and the Putative Class*